NOTICE:  Summary decisions issued by the Appeals Court pursuant to M.A.C. Rule 23.0, as appearing in 97 Mass. App. Ct. 1017 (2020) (formerly known as rule 1:28, as amended by 73 Mass. App. Ct. 1001 [2009]), are primarily directed to the parties and, therefore, may not fully address the facts of the case or the panel's decisional rationale.  Moreover, such decisions are not circulated to the entire court and, therefore, represent only the views of the panel that decided the case. A summary decision pursuant to rule 23.0 or rule 1:28 issued after February 25, 2008, may be cited for its persuasive value but, because of the limitations noted above, not as binding precedent.  See Chace v. Curran, 71 Mass. App. Ct. 258, 260 n.4 (2008).

COMMONWEALTH OF MASSACHUSETTS

APPEALS COURT

24-P-331
24-P-335

COMMONWEALTH

vs.

ERIC CARATTINI (and a consolidated case[1]).

MEMORANDUM AND ORDER PURSUANT TO RULE 23.0

The issue presented in these two consolidated interlocutory appeals is whether the observation of an exchange of currency for a small item between an unidentified man and the defendant, Jose Mendez,[2] by a police officer experienced in narcotics investigations in an area described as an "open-air market" for illegal drug activity, provided the officer with probable cause to believe a drug transaction had occurred.  Here, the officer who witnessed the exchange believed that probable cause existed.

---

[1] Commonwealth vs. Jose Mendez, case no. 24-P-335.

[2] The Commonwealth refers to the defendants' names as they appear in the indictments, as do we.  See Commonwealth v. Leoner-Aguirre, 94 Mass. App. Ct. 581, 581 n.1 (2018).

Consequently, he and four police officers approached the car Mendez was driving and ordered him out of the vehicle. The exit order extended to the front seat passenger, codefendant Eric Carattini. Ultimately, the police recovered a firearm from Mendez's front shirt pocket, as well as drugs and firearms from the car.

The defendants were arrested and charged with various firearm and drug offenses.[3] They each filed a motion to suppress

---

[3] Carattini was charged with trafficking in more than ten grams of fentanyl, G. L. c. 94C, § 32E (c1/2); unlawful possession with intent to distribute heroin, G. L. c. 94C, § 32 (a); unlawful possession with intent to distribute oxycodone, G. L. c. 94C, § 32A (a); illegal possession of a firearm, G. L. c. 269, § 10 (a); unlawful possession of a loaded firearm, G. L. c. 269, § 10 (n); unlawful possession of ammunition without a firearm identification (FID) card, G. L. c. 269, § 10 (h) (1); unlawful possession of a large capacity weapon, G. L. c. 269, § 10 (m); and possession of a large capacity firearm during the commission of a felony, G. L. c. 265, § 18B.

Mendez was charged with trafficking in more than ten grams of fentanyl, G. L. c. 94C, § 32E (c1/2); unlawful possession of a large capacity weapon, G. L. c. 269, § 10 (m); possession of a large capacity firearm during the commission of a felony, G. L. c. 265, § 18B; two counts of unlawful possession of a loaded firearm, G. L. c. 269, § 10 (n); possession of a firearm during the commission of a felony, G. L. c. 265, § 18B; unlawful possession with intent to distribute heroin, subsequent offense, G. L. c. 94C, § 32 (b); two counts of illegal possession of a firearm with one prior violent crime or serious drug offense, G. L. c. 269, § 10G (a); two counts of unlawful possession of ammunition without an FID card with one prior violent crime or serious drug offense, G. L. c. 269, § 10 (h); and unlawful possession with intent to distribute oxycodone, subsequent offense, G. L. c. 94C, § 32A (b).

2

all evidence found during the encounter, claiming that they were unlawfully seized when five officers approached their car without probable cause or reasonable suspicion of criminal activity, and that the exit order was invalid.  Mendez further claimed that the police pat frisked him without reason to believe that he was armed and dangerous.  Following an evidentiary hearing, a judge of the Superior Court concluded that the officers lacked reasonable suspicion of criminal activity, and he allowed the motions to suppress.[4]  The Commonwealth's application for leave to file an interlocutory appeal was allowed by a single justice of the Supreme Judicial Court, who reported the matter to this court.  For the reasons that follow, we now reverse.

Background.  We summarize the relevant facts from the judge's findings on the motions to suppress, supplemented where appropriate by uncontroverted testimony that the judge explicitly or implicitly credited.  See Commonwealth v. Jones-Pannell, 472 Mass. 429, 431 (2015).

At approximately 2:30 P.M. on October 22, 2019, Detective William Delgado and members of the Western Massachusetts Gang Task Force (task force) were doing "spot check surveillance" in

_____

[4] In light of his conclusion, the judge did not reach the issues whether the exit order or patfrisk were justified.

3

the area of Lyman and Chestnut Streets in the town of Holyoke. Detective Delgado, who at the time had been a police officer with the Holyoke police department for twenty-one years and had made "hundreds of narcotics arrests in the city," recently had received complaints of increased illegal narcotics activity at that location. During his direct testimony, Detective Delgado adopted the prosecutor's description of the area as an "open-air market" for drug sales.

Detective Delgado parked on Chestnut Street, "specifically" to check for narcotics activity. He observed a man, whom he did not recognize and who was never identified, walk up to the driver's side of a white Honda Pilot. The man had a brief conversation with the driver, Mendez. Detective Delgado, who was approximately fifty to sixty feet away, saw the man give Mendez money in exchange for a small item. Although Detective Delgado saw the money, he could not identify the item that was exchanged. The man then walked away out of view and the Honda departed.

Detective Delgado believed that he had observed a narcotics transaction and began to follow Mendez. He was in plain clothes and in an unmarked police vehicle with two other members of the task force. Mendez drove about three and a half blocks before parking lawfully. Detective Delgado pulled in behind the Honda,

4

and all three officers approached the car.  Detective Delgado and one officer went to the driver's side while a third officer went to the passenger's side.  Within "seconds," two additional officers, who also were driving an unmarked vehicle, arrived and joined the officer on the passenger's side of the car.  Detective Delgado identified himself to Mendez.  At the same time, he recognized Carattini from a prior homicide investigation and a recent social media post on Facebook in which Carattini was holding a firearm.  Detective Delgado ordered the defendants out of the car and opened the driver's side door.  Mendez closed the door and refused to exit.  Detective Delgado opened the door again and Mendez was forced out of the car, put on the ground, and handcuffed.  The officers pat frisked Mendez and found a firearm in his front shirt pocket.  Meanwhile, Carattini cooperated with the officers and got out of the car.  He too was handcuffed and detained while the police searched the car and found, among other items, firearms, "heroin, oxycodone pills, a scale, [and] U.S. currency."

As noted, the judge allowed the defendants' motions to suppress.  Based on the facts we have summarized, he concluded that the police lacked reasonable suspicion of criminal activity at the time the defendants were seized, which the judge

5

determined occurred when five police officers approached (and surrounded) Mendez's car.

Discussion.  We accept the judge's factual findings unless they are clearly erroneous.  See Commonwealth v. Welch, 420 Mass. 646, 651 (1995).  However, we "make an independent determination of the correctness of the judge's application of constitutional principles to the facts."  Commonwealth v. Mercado, 422 Mass. 367, 369 (1996).  In this case, none of the material facts are in dispute, but the judge's application of the law to those facts was incorrect.[5]

In reaching his conclusion, the judge relied primarily on Commonwealth v. Ellis, 12 Mass. App. Ct. 476 (1981), and Commonwealth v. Clark, 65 Mass. App. Ct. 39 (2005).  He reasoned that the observation of an exchange between two unknown men (a pedestrian and the driver of a car) of a small object for money on a public street amounted to no more than a "hunch" that a

---

[5] We note that in both briefs the Commonwealth argues only that the judge erred by concluding that the police lacked reasonable suspicion of criminal activity, and it requests that the case be remanded for additional findings on the validity of the exit order and the patfrisk of Mendez.  However, at the hearing on the defendants' motions to suppress, the Commonwealth asserted that Detective Delgado's observations established probable cause to stop, search, and arrest both defendants. When asked during oral argument whether the Commonwealth still maintained that there was probable cause to arrest the defendants, the appellate prosecutor responded affirmatively.

crime had been committed.  The facts in these two cases are distinguishable from the facts present here.

In Ellis, 12 Mass. App. Ct. at 477, we concluded that a police officer lacked reasonable suspicion of criminal activity to justify the stop of a motor vehicle where he had observed three persons conversing through the window of a car in a parking lot, and then saw one of them hand over what the officer believed to be money in exchange for an unidentified item. There was no evidence, as there is here, that the exchange occurred in an area known for drug activity, or that the observing police officer had special experience in the investigation of narcotics sales.

In Clark, 65 Mass. App. Ct. at 44-45, we concluded that a police officer had no legally sufficient basis for stopping the defendant's motor vehicle based on his observation of the defendant, who was standing by his car in a "high drug area," handing an item to a man whom the officer knew to be a bartender from another section of the town, in exchange for money.  While there was evidence that the location of the exchange was known for drug activity, there was no suggestion, as there is here, of a direct connection between the specific location and drug activity.  See id.  In other words, the location where the exchange at issue occurred in this case was not simply a "high

drug area." Rather, Detective Delgado and the other task force agents were at that location specifically to conduct surveillance as a result of recent complaints about illegal drug activity. See Commonwealth v. Freeman, 87 Mass. App. Ct. 448, 452-453 & n.7 (2015) (testimony about recent increase in drug activity in area where alleged drug transaction occurred deemed to be significant). See also Commonwealth v. Kennedy, 426 Mass. 703, 704 (1998) (receipt of numerous complaints from neighbors about drug dealing at particular intersection contributed to finding of probable cause). In addition, while the officer in Clark, supra at 40, had been involved in at least one hundred drug arrests during his eight-year tenure as an officer, he did not have Detective Delgado's level of expertise in narcotics investigations.

Although this case is close, in our view, the facts compare favorably with those in Commonwealth v. Santaliz, 413 Mass. 238, 241 (1992), where the Supreme Judicial Court concluded that there was probable cause to believe a drug transaction had occurred based on a similar scenario. In that case, the police observed the defendant receive an item from a person who was sitting with him on a porch and then exchange it for money with a person who arrived at their location in a taxicab. See id. at 239-240. The court considered the following four factors in

8

reaching its conclusion: (1) "the unusual nature of the transaction"; (2) "the furtive actions of the participants"; (3) "the encounter occur[ed] in a place known to the police as a place of high incidence of drug traffic"; and (4) "an experienced officer on the scene, who had made numerous drug arrests in the neighborhood, considered the event as revealing a drug sale." Id. at 241.

The facts in this case, as found by the judge, satisfy each factor considered by the court in Santaliz. The transaction was unusual in that it was quick, the item exchanged between the defendant and the unidentified man was small, and as soon as the exchange was made, the man walked away, and the defendant drove off. Objectively, this conduct also could be viewed as "furtive." See Commonwealth v. Freeman, 87 Mass. App. Ct. at 453 n.5. As previously noted, the area was not only known for illegal drug activity, but Detective Delgado had received reports of an increase in drug sales where the exchange occurred. Lastly, there is no dispute that Detective Delgado was experienced in street-level drug transactions. In concluding that the facts known to Detective Delgado established probable cause to believe a drug transaction had occurred, we acknowledge that there could have been an innocent explanation for the exchange. However, Detective Delgado "was entitled to

view [the transaction] through the lens of his specialized training and experience and conclude that more than mere coincidence was involved, and that he had witnessed a drug transaction."  Commonwealth v. Freeman, supra at 454.

For these reasons, the order allowing the defendants' motions to suppress is reversed.[6]

So ordered.

By the Court (Vuono, Meade & Hand, JJ.[7]),

*Paul Little*

Clerk

Entered:  March 7, 2025.

---

[6] Given our conclusion that the police had probable cause to arrest Mendez, we need not reach the question whether the defendants were seized at the time the officers approached Mendez's car.  Nor do we need to address the validity of the exit order as to Mendez or the patfrisk.  Furthermore, once Mendez was lawfully stopped and Detective Delgado recognized Carattini, the exit order as to Carattini was justified.  He was then lawfully arrested following the search of the car.

[7] The panelists are listed in order of seniority.